**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

RUTH DENHAM, as personal representative for the estate of Tracy Lee Veira,

    Plaintiff,

v.                                                 Case No: 6:13-cv-1425-Orl-40KRS

CORIZON HEALTH, INC. and VOLUSIA COUNTY, a political subdivision of the State of Florida,

    Defendants.

## ORDER

This cause comes before the Court without oral argument on the following:

1. Defendant, Corizon Health, Inc.'s, Dispositive Motion for Summary Judgment and Memorandum of Law in Support Thereof (Doc. 44), filed February 2, 2015;

2. Defendant Volusia County's Motion for Summary Judgment (Doc. 48), filed February 3, 2015;

3. Plaintiff's Response to Motions for Summary Judgment (Doc. 60), filed February 20, 2015;

4. Defendant Volusia County's Reply Memorandum to Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 68), filed March 5, 2015; and

5. Defendant, Corizon Health, Inc.'s, Amended Memorandum of Law and Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment

1

(Doc. 74), filed April 1, 2015.

Upon consideration and review of the record, including all pleadings, affidavits, exhibits, and memoranda of respective counsel, the Court grants summary judgment in favor of Defendants.

**I.     BACKGROUND**

On September 9, 2009, Tracy Lee Veira ("Veira") turned herself in at the Volusia County Jail after a warrant was issued for her arrest. (Doc. 46-17; Doc. 60-2, ¶ 3). Prior to her incarceration, Veira was being treated for chronic pain and was prescribed Oxycodone and Xanax as part of her pain management regimen. (Doc. 60-15). However, because these narcotics are not allowed to be distributed to inmates, Veira soon began to experience opiate and Xanax withdrawal. (Doc. 60-23). On September 12, 2009, Veira was transferred from the general population to a medical segregation area in order to monitor and treat her withdrawal symptoms. (Doc. 60-19). The next day, jail medical staff started Veira on an opiate and Xanax withdrawal medication protocol. (Doc. 44-3, p. 8).

Over the next three days, medical staff continued to monitor and treat Veira's withdrawal symptoms. (Doc. 46-22; Doc. 60-17; Doc. 60-23; Doc. 60-35). Jail records indicate that corrections staff also observed Veira and recorded Veira's status every fifteen minutes as required by jail policy for inmates with Veira's medical needs. (Doc. 47-1; Doc. 60-21). On September 16, 2009 at 9:30 a.m., corrections staff noted that Veira was lying on her bunk breathing. (Doc. 60-21, p. 5). Twenty-four minutes later, corrections staff found Veira in her cell unresponsive. (Doc. 55, ¶ 18). A Code Blue was called, corrections and medical staff responded, and CPR was initiated. (*Id.* ¶¶ 4, 8, 18).

EMS was called and responded to the jail. (*Id.* ¶ 20). Paramedics pronounced Veira dead shortly thereafter. An autopsy conducted the next day revealed that Veira's death resulted from physiological symptoms caused by opiate withdrawal. (Doc. 60-10).

Plaintiff, as personal representative for Veira's estate, initiated this action on September 13, 2013. (Doc. 1). Plaintiff sues Volusia County, a political subdivision of the State of Florida, and the county's inmate medical services provider, Corizon Health, Inc. ("Corizon"). In her one-count complaint, Plaintiff alleges that Volusia County and Corizon violated Veira's constitutional rights under 42 U.S.C. § 1983 by acting (or failing to act) with deliberate indifference to Veira's serious medical needs. Defendants now move for summary judgment.

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). However, "[t]he court need not consider only the cited materials" and may consider any other material in the record. Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record

demonstrating a lack of genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts. *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006), *cert. denied* 549 U.S. 996 (2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587; *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (holding that a non-movant carries its burden on summary judgment only by "identify[ing] affirmative evidence" which creates a genuine dispute of material fact).

In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

### III.   DISCUSSION

#### A.   Local Government Liability Under § 1983

Section 1983 provides the procedural mechanism for vindicating constitutionally protected rights violated by persons who act under color of state law. *Laster v. City of*

4

*Tampa Police Dep't*, 575 F. App'x 869, 872 (11th Cir. 2014) (per curiam). Although the Eighth Amendment's protections against cruel and unusual punishment do not apply to pretrial detainees like Veira, the Fourteenth Amendment's Due Process Clause provides the same constitutional guarantees. *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994). Thus, pretrial detainees like Veira are entitled to receive "such basic necessities as . . . medical care," which includes the "right to receive medical treatment for illness and injuries." *Id.* (internal quotation marks omitted). The failure to provide a pretrial detainee with adequate medical care offends the Constitution and may be remedied through § 1983. *Id.*

Where a plaintiff claims that she has suffered injuries resulting from constitutionally inadequate medical care, she must demonstrate that jail officials displayed "deliberate indifference" to her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). When the defendant is a local government entity such as Volusia County or Corizon,[1] the plaintiff can only establish deliberate indifference by showing that the defendant acted "pursuant to [an] official municipal policy of some nature." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Therefore, deliberate indifference to serious medical needs requires the plaintiff to show a "direct causal link" between a local

---

[1] The determination of whether a party is a local government entity for purposes of § 1983 is a question of state law. *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 786 (1997). Additionally, when a government function is performed by a private entity like Corizon, the private entity is treated as the functional equivalent of the government for which it works. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985). The parties agree that, for the purposes of this case, Volusia County is a local government and that, by virtue of its performance of a government function for Volusia County, Corizon is to be treated as a local government under § 1983.

government policy and her constitutional injuries. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

Local government policy can come in different forms. Intuitively, the most common example is the enforcement of an officially promulgated policy such as an ordinance, rule, regulation, code, or a decision rendered by a policymaker. *See, e.g.*, *Monell*, 436 U.S. at 694–95; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). Less-than-formal policies may also cause constitutional violations that subject a local government to liability. For example, a local government will be liable under § 1983 when the plaintiff's constitutional injuries were caused by an unofficial custom or practice of the local government that is so well-settled, permanent, pervasive, and wide-spread that it "takes on the force of the law." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (internal quotation marks omitted). Likewise, a local government will be liable where the plaintiff's constitutional injuries were caused by a custom or practice of inaction to preserve constitutional rights. *City of Canton*, 489 U.S. at 388–89.

Ultimately, regardless of whether a plaintiff intends to premise liability on an official policy or on an unofficial custom, a local government will only be held responsible "for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403–04 (1997). A local government will not be liable under § 1983 for random acts, isolated incidences, or customs or practices of which its policymakers were unaware. *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). Therefore, although a custom need not receive formal approval, the plaintiff must show actual or constructive knowledge of the

custom by a government policymaking body. *Id.* Finally, a local government cannot be held liable under the doctrines of *respondeat superior* or vicarious liability for the constitutional wrongdoings of its employees or agents. *City of Canton*, 489 U.S. at 385; *Laster*, 575 F. App'x at 872. Only those constitutional violations attributable to the local government's policymakers warrant liability. *Brown*, 520 U.S. at 403–04.

### B. Defendants' Motions for Summary Judgment

Defendants move for summary judgment for similar reasons. Corizon contends that there is no genuine dispute of material fact that Plaintiff cannot point to a policy or custom of Corizon that caused her constitutional injuries. (Doc. 44, pp. 11–13). Volusia County also maintains that there is no genuine dispute of material fact that Plaintiff cannot show an official policy that resulted in the alleged constitutional violations. (Doc. 48, p. 10). Although Volusia County recognizes that Plaintiff has alleged an unofficial custom that may have caused Veira's constitutional injuries, it submits that there is no evidence in the record to support a rational jury finding in Plaintiff's favor. (*Id.* at pp. 10–15; Doc. 68, pp. 6–8). The Court discusses each argument in turn.

#### 1. Corizon

Corizon asserts that Plaintiff fails to identify any policy or custom that violated Veira's constitutional rights. Further, Corizon shows that Veira received appropriate and timely medical attention from Corizon's staff, evidenced by jail records indicating that Corizon's staff interacted with Veira every day to monitor and treat her withdrawal symptoms. (Doc. 44-3; Doc. 44-5). Therefore, Corizon has met its initial burden of showing no dispute of material fact on this issue.

In her response, Plaintiff does not cite any policy of Corizon that violated Veira's constitutional rights. Rather, Plaintiff complains of certain deficiencies in the medical care provided to Veira by Corizon's medical staff. Plaintiff claims that Corizon's intake staff "failed to document the frequency of dosage of Ms. Veira's prescribed medications, failed to verify her prescriptions, and failed to record whether her indicated weight was actual or reported." (Doc. 60, p. 2). In support, Plaintiff submits the sworn declaration of Inga Jones, a former Corizon employee, who states that these deficiencies in intake documentation were common at Corizon and well-known by Corizon's administrators. (Doc. 60-4, ¶ 31).[2]

While a rational jury could find that the failure to accurately complete intake paperwork constitutes a custom at Corizon, Plaintiff fails to produce affirmative evidence showing a direct causal link between this custom and Veira's death. The only record evidence speaking to the cause of Veira's death is the medical examiner's autopsy report and the reports of Plaintiff's experts, Dr. Kris Sperry and Dr. Richard Greer.[3] The autopsy

---

[2] Corizon objects to Ms. Jones' declaration on numerous grounds. Of importance to the Court here, Corizon objects to the extent Ms. Jones makes statements about topics over which she clearly has no personal knowledge. For example, Ms. Jones prefaces many of her statements with "It is my understanding that," indicating that Ms. Jones does not derive the remainder of her statement from personal knowledge, but from another source. (Doc. 60-4, ¶¶ 25–29). Because all declarations used to oppose a motion for summary judgment must be made on personal knowledge, Fed. R. Civ. P. 56(c)(4), Corizon's objection is sustained. The Court will not consider paragraphs 25 through 29 of Ms. Jones' declaration. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1301 n.46 (11th Cir. 2012).

[3] Corizon objects to Plaintiff's expert reports on the grounds that they are not made under oath. (Doc. 74, p. 6 n.2). It is true that unsworn expert reports generally should not be considered by a district court on summary judgment. *See Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003). Notwithstanding, in cases involving important constitutional questions such as this one, the Court favors consideration of the most complete record available. *See Pettinaro Constr. Co., Inc. v. Del. Auth. for Reg'l Transit*, 500 F. Supp. 559, 563 (D. Del. 1980). Corizon's objections are therefore

report reveals that Veira died from "aspiration bronchopneumonia" resulting from opiate withdrawal. (Doc. 60-10). Dr. Sperry and Dr. Greer do not propose that Veira's death was the consequence of any shortcoming in Veira's intake paperwork; rather, both experts opine that Veira died from "complications of severe vomiting and dehydration," which could have been prevented had Corizon's medical staff conducted additional diagnostic tests or had Volusia County's corrections officers actually observed Veira at the required time intervals. (Doc. 60-12, pp. 2–3; Doc. 60-13, pp. 4–5). Based on this evidence, it cannot be said that the failure to verify prescriptions or to accurately record Veira's weight at intake are causally related to her death. Without a direct causal link between Corizon's custom and Veira's constitutional injuries, Corizon cannot be liable under § 1983. *City of Canton*, 489 U.S. at 385.

Plaintiff additionally contends that Veira found it difficult to obtain medical attention while housed in the jail's medical segregation area. (Doc. 60, p. 3; Doc. 66). To the extent Plaintiff's argument could be construed as pointing to a custom of providing inadequate medical care, Plaintiff's assertion is refuted by the record evidence. Medical records submitted by Plaintiff indicate that Corizon's staff interacted with Veira multiple times every day, during which nurses monitored Veira's symptoms, provided withdrawal protocol medications, and recorded her vitals. (Doc. 60-4, ¶ 10; Doc. 60-17; Doc. 60-22; Doc. 60-23; Doc. 60-35; *see also* Doc. 46-22). Because Plaintiff fails to show a genuine dispute of material fact that Veira's constitutional injuries were directly linked to Corizon's policy or custom, summary judgment must be granted in Corizon's favor.

---

overruled. Nevertheless, the Court notes that the opinions expressed in an unsworn expert report are inherently less reliable than those attested to under penalty of perjury.

### 2. Volusia County

Volusia County also moves for summary judgment on the grounds that the record evidence fails to support Plaintiff's claim that a policy or custom violated Veira's constitutional rights. First, Volusia County contends that no official policy could have caused Veira's constitutional injuries, as Volusia County Department of Corrections Policy Number 400.15 ("Policy 400.15") was in effect and enforced while Veira was incarcerated.[4] (Doc. 47-1). Although Plaintiff's Complaint premises liability in part on an unidentified official policy of Volusia County, it appears that Plaintiff has abandoned this theory in her response to summary judgment, as Plaintiff identifies no official policy. Accordingly, there is no genuine dispute of material fact that Veira's constitutional injuries were not caused by Volusia County's official policy and Volusia County is entitled to summary judgment on this issue.

Next, Volusia County asserts that there is no genuine dispute of material fact that Volusia County's policymakers had no knowledge of any unofficial custom that violated Veira's constitutional rights. To that end, Volusia County identifies two customs upon which Plaintiff attempts to impose § 1983 liability: (1) the custom of corrections officers to falsify and manipulate inmate observation records and (2) Volusia County's failure to train corrections officers who guard inmates in the jail's medical segregation area with appropriate medical training.

Regarding inmate observation, Policy 400.15 required a corrections officer to observe Veira every fifteen minutes and to record her status on a "special inmate watch"

---

[4] Policy 400.15 is Volusia County's policy for monitoring inmates who have been removed to the jail's medical segregation area. Policy 400.15 is attached to this Order as Appendix A.

log. (Doc. 47-1). The special inmate watch logs produced by Volusia County show that a corrections officer observed Veira and recorded her status approximately every fifteen minutes beginning September 12, 2009 at 8:19 p.m. and ending September 16, 2009 at 9:54 a.m. when Veira was found unresponsive in her cell.[5] (Doc. 46-8, pp. 6–10). As to any claim that corrections officers would routinely falsify or manipulate the special inmate watch logs, Volusia County asserts that it had no knowledge of such malfeasance and that, if it had, it would have stopped the misconduct. In support, Volusia County shows that it disciplines corrections officers who do not comply with Policy 400.15, as evidenced by the issuance of eight disciplinary actions related to noncompliance with Policy 400.15 in the four years prior to Veira's death. (Doc. 47, ¶ 10). Therefore, Volusia County has carried its initial burden of showing that it had no knowledge of a custom that corrections officers routinely falsified or manipulated inmate observation records.

In response, Plaintiff calls into question the credibility of Veira's observation records. Plaintiff points to the fact that two officers were reprimanded for writing false observation times and statuses on Veira's special inmate watch log for September 16, 2009. (Doc. 60-28; Doc. 60-29). Additionally, Plaintiff produces the sworn declarations of Anthony Digregorio and Susan Virgilio, former Volusia County corrections officers. (Doc. 60-3; Doc. 60-8). In their declarations, Mr. Digregorio and Ms. Virgilio aver that officers frequently lied about observation times and inmate statuses because it was not feasible to observe each inmate every fifteen minutes in light of the other work that

---

[5] Of the 353 entries in Veira's special inmate watch logs, only one gap significantly departs from the fifteen minute observation requirement: Veira went unobserved from 8:45 p.m. to 9:21 p.m. on September 15, 2009, a total of thirty-six minutes. (Doc. 46-8, p. 7).

needed to be completed during a given shift. (Doc. 60-3, ¶¶ 11–17, 37–41; Doc. 60-8, ¶¶ 5–14). According to Mr. Digregorio and Ms. Virgilio, it was common for medical segregation inmates to go two to three hours without observation; corrections officers would simply "backfill" the special inmate watch logs later in their shift. (Doc. 60-3, ¶¶ 16–17; Doc. 60-8, ¶ 9). Plaintiff also points to the expert opinions of Dr. Sperry and Dr. Greer,[6] who opine that, based on the extent of livor mortis exhibited by her body, Veira died approximately one to two hours before being found; thus, any observations recorded in Veira's special inmate watch logs within one to two hours of her being found are clearly false. (Doc. 60-12, pp. 2–3; Doc. 60-13, p. 5). Plaintiff therefore concludes that a fact issue remains as to whether a custom of records falsification caused Veira's death.

Although a rational jury could certainly find this evidence to amount to a custom of records falsification and that this custom resulted in Veira's death, Plaintiff fails to produce affirmative evidence showing any sort of knowledge of this custom by the pertinent policymakers. The extent of the record evidence demonstrates that only the corrections officers and their immediate supervisors knew about the practice of backfilling special inmate watch logs. (*See* Doc. 60-3, ¶¶ 17, 20; Doc. 60-8, ¶¶ 5, 8–12, 14). Plaintiff does not indicate, let alone produce evidence, that Volusia County's policymakers or the policymakers in its department of corrections had actual or constructive knowledge of the constitutionally-violative practice. Moreover, Plaintiff fails to dispute that Volusia County disciplined corrections officers whenever it learned of such violations, indicating that the county never condoned or acquiesced to the practice. A local government cannot be held

---

[6] Volusia County objects to Dr. Sperry's expert report on the grounds that it is not made under oath. (Doc. 68, pp. 4–5). For the same reasons stated in note 3, *supra*, Volusia County's objection is overruled.

12

liable under § 1983 either for customs of which its policymakers had no knowledge, *Depew*, 787 F.2d at 1499, or for the constitutional wrongdoings of its employees under *respondeat superior*, *City of Canton*, 489 U.S. at 385. Accordingly, Plaintiff fails to raise a genuine factual dispute about Volusia County's knowledge of an unconstitutional custom and summary judgment must be granted in its favor on the theory that corrections officers falsified and manipulated inmate observation records.

Similarly, Volusia County maintains that it cannot be held liable for failing to train corrections officers who guard inmates in the jail's medical segregation area because there is no evidence of the county's deliberate indifference. (Doc. 68, pp. 7–8). A plaintiff can prove deliberate indifference through a failure to train in one of two ways. First, a local government is deliberately indifferent under a failure to train theory where there is a widespread pattern of similar constitutional violations by untrained employees. *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). Alternatively, a local government can be liable for a single incident where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent." *City of Canton*, 489 U.S. at 390. However, showing that the level of training provided is not optimal or even preferable is not enough to rise to the level of deliberate indifference. *Id.* at 391; *Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 503 (1st Cir. 2012) ("[T]he fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to [show deliberate indifference].") (internal quotation marks omitted).

Volusia County holds that there is no genuine dispute of material fact that its failure to provide medical training to corrections officers who guard inmates in the medical

segregation area does not amount to deliberate indifference. Volusia County shows that it contracts with Corizon for the purpose of providing medical services to its inmates and that, as a result, corrections officers are not allowed to perform medical functions except in emergencies. (Doc. 47, ¶¶ 11–12). Further, Volusia County demonstrates that Corizon was at all times capable of providing these medical services, as evidenced by jail records indicating that Corizon's medical staff interacted with Veira multiple times each day. (Doc. 60-17; Doc. 60-22; Doc. 60-23; Doc. 60-35). Volusia County has therefore met its initial burden of showing no genuine dispute that it was not deliberately indifferent to the training of its corrections officers in the jail's medical segregation.

Although less than clear in her response, Plaintiff appears to argue that Volusia County is liable for a failure to train because the need to provide medical training to corrections officers who guard inmates in the jail's medical segregation area is obvious. (Doc. 60, pp. 14–15). In support, Plaintiff cites to *Young v. City of Augusta, Georgia ex rel. DeVaney*, 59 F.3d 1160 (11th Cir. 1995), in which the Eleventh Circuit reversed the district court's entry of summary judgment in favor of a city where a fact issue remained as to whether the city exhibited deliberate indifference by failing to train jail employees to recognize the need to hospitalize or provide medication to mentally ill inmates.

However, the facts in *Young* are readily distinguishable from the facts in this case. Young suffered from a manic-depressive disorder which caused her to hallucinate and act violently when she did not receive medication. *See id.* at 1163–65. While unmedicated in an isolation cell, Young informed guards that she was hearing voices, threw her food trays against the wall, and engaged in verbal altercations with guards. *Id.* at 1164–65. One such verbal altercation ultimately escalated to a physical confrontation

14

during which one guard beat Young while she was shackled to her bed. *Id.* at 1165. In reversing summary judgment, the Eleventh Circuit held that the guards' failure to identify Young as having a mental illness requiring medication or hospitalization could have resulted from the city's failure to train and that this failure to train could constitute deliberate indifference under § 1983 if the city's choice not to train was a conscious one made by the city's policymakers. *Id.* at 1171–72.

Here, no rational jury could find that Volusia County's choice not to provide medical training to corrections officers who guard inmates in the medical segregation area amounts to deliberate indifference. The difference between this case and *Young* is that the city in *Young* provided *no* staff trained to address the medical and psychiatric needs of inmates. Volusia County, however, contracted with Corizon to assume responsibility for providing medical services to inmates. (Doc. 47, ¶ 11). As a result, corrections officers are not charged with providing medical care except in emergency situations, allowing Volusia County's staff to focus on corrections-related activities. (*Id.* ¶ 12). Moreover, Plaintiff provides no evidence that Corizon's medical services were so lacking that Volusia County's corrections officers should have been required to step in to ensure constitutionally sufficient medical care. To the contrary, the evidence submitted by Plaintiff indicates that Corizon was fully capable of satisfying inmate medical needs, as Corizon's medical staff quickly identified Veira as suffering from opiate and Xanax withdrawal (Doc. 60-17; Doc. 60-18), removed her to the jail's medical segregation area (Doc. 60-19), initiated the appropriate withdrawal medication protocol (Doc. 60-35), and continuously monitored her symptoms and treatment (Doc. 60-22; Doc. 60-23).

Whatever may be said of Volusia County's policy choice to outsource the provision of inmate medical services, it cannot be said that this choice exhibits deliberate indifference toward inmate medical care.  It might indeed be preferable to also provide medical training to corrections officers who guard inmates known to have serious medical needs.  However, the availability of more preferable policy choices is not enough to evince deliberate indifference.  *Marrero-Rodriguez*, 677 F.3d at 503.  Volusia County provided inmates with medical services through Corizon and there is no evidence in the record that Corizon's medical services were inadequate.  The fact that Volusia County made the policy choice to contract with a third party to provide inmate medical services is not enough, by itself, to impose liability for a failure to train.  Accordingly, Plaintiff has failed to raise a genuine dispute of material fact on this issue and Volusia County is entitled to summary judgment.

As a final matter, Plaintiff's Complaint alleges that Veira's death may have been caused by a policy or custom of understaffing the jail (Doc. 1, ¶ 18), and Plaintiff makes a cursory allusion to the issue in her response (Doc. 60, p. 6).  However, Plaintiff does not cite any evidence related to understaffing.  As such, the Court finds that Plaintiff has abandoned this argument.  There being no other theory upon which Plaintiff bases liability, the Court will grant summary judgment in favor of Volusia County.

## IV.  CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant, Corizon Health, Inc.'s, Dispositive Motion for Summary Judgment (Doc. 44) is **GRANTED**.

2. Defendant Volusia County's Motion for Summary Judgment (Doc. 48) is **GRANTED**.

3. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants, Corizon Health, Inc. and Volusia County, Florida, and against Plaintiff, Ruth Denham.

4. The Clerk of Court is further **DIRECTED** to terminate all pending motions (Docs. 79, 80, 81, 82, 83) and to close the file.

**DONE AND ORDERED** in Orlando, Florida on June 4, 2015.

*(signature)*
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

# **APPENDIX A**

| VOLUSIA COUNTY DIVISION OF CORRECTIONS POLICY AND PROCEDURE MANUAL | POLICY NO. 400.15 | Page 1 of 2 |
|---|---|---|
| SUBJECT: SECURITY AND CONTROL<br><br>Special Inmate Inspection Record VCDC-52 | DATE: September 19, 2008<br><br>SUPERSEDES: September 22, 2006 | |

**POLICY**

It is the policy of the Volusia County Division of Corrections to properly document and keep current records on all inmates in confinement or on any type of special watch as dictated by Medical, Custodial or Mental Health personnel.

**REFERENCE**

ACA 3-ALDF-1A-17; 3-ALDF-3A-10; 3-ALDF-3D-08; F.M.J.S. 4.10, 5.04, 5.05, 5.08 (n) i, ii

**RESPONSIBILITY**

It shall be the responsibility of the Shift Commander (SC), Operations Supervisor (OS) and Housing Unit Supervisor (HUS) to ensure that all staff are properly documenting and keeping current all records of segregated inmates.

**PROCEDURE**

A. When an inmate is ordered into any type of confinement or is placed on any type of watch as directed by Medical, Custodial or Mental Health personnel, the Housing Unit Officer (HUO) for the area where the inmate is housed shall ensure that a Special Inmate Inspection Record (VCDC-52) is initiated.

B. This form shall indicate either a special watch or record of segregation by having the proper space marked. All blanks must be completed including the reason or special comments section, listing why the inmate is in confinement or on a special watch.

   1. VCDC-52 record of segregation

      a) When an inmate is confined to his/her cell for any reason, a VCDC-52 shall be used with the section of the form indicating Record of Segregation checked. For this purpose entries are made a minimum of every two (2) hours by the custodial staff and a minimum of once every seventy-two (72) hours by Medical Staff. To make an entry, custodial staff must see the inmate and record the physical appearance and attitude, date and time of entry and what the inmate is doing. All entries shall be made using numbers as reflected in the code explanation column. The employee number shall be recorded indicating who is making the entry. In order to record the attitude, the staff member must talk to the inmate. When the inmate is sleeping it is not necessary to awaken them. The representative from Medical must speak with the inmate confined and record the information required in the space provided.

      b) Entries are made to this form whenever the inmate is visited by a staff member, fed chow, during security inspections, when the inmate is removed from the cell for showers, recreation, phone calls or interviews and any other time staff believes entries should be made. As a result, there may be more than one entry made every two hours.

      c) The VCDC-52s are kept in chronological order on the unit where the inmate is housed. When the inmate is released from confinement, the final entry is made, the VCDC-52s are forwarded to the Warden's office for filing.

      d) All inmates in confinement shall be seen and talked to by the HUS/OS at least twice daily, between the hours of 0800 and 2300.

Policy 400.15
Page 2 of 2

    e) The night shift HUS/OS responsible for the units where the confined inmates are housed, shall review the VCDC-52s each day to ensure compliance with Florida Model Jail Standards and ACA standards in all areas, specifically meals, recreation, showers, periodic documentation, medical attention, medical checks or special needs of the inmate. After review, a notation shall be made in the space provided. Any discrepancies shall be corrected if possible and reported to the SC.

2. VCDC-52 special inmate inspection record

    a) A VCDC-52 is maintained on all inmates that are placed on any type of watch. The inmate may or may not be in confinement. Inmates are placed on watches by Medical, Mental Health and Custodial Staff. Only the Medical and Mental Health staff can remove watches on inmates. Custodial staff shall not remove watches on inmates.

    b) The length of the watch or the length of time between when the inmate is to be seen by staff is determined by the reason the inmate was placed on a watch. There are different types of watches:

        1) CONSTANT WATCH: A staff member is assigned to directly watch a particular inmate constantly. This type of watch is appropriate for an extreme security risk or for an inmate that has displayed suicidal gestures or made suicidal statements. Entries shall be made at a minimum of every fifteen (15) minutes.

        2) 15 MINUTE WATCH: A staff member shall observe an inmate in time intervals not to exceed every 15 minutes and documented as such.

        3) PERIODIC WATCH: The staff member that assigns the inmate to the watch shall determine the length of the watch and record that time span on the space provided on the form. The time span shall not exceed one (1) hour.

    c) The VCDC-52s are kept in chronological order on the unit where the inmate is housed. When the inmate is taken off the watch, the VCDC-52s are forwarded to the Warden's office for filing.

    d) The VCDC-52 shall be inspected daily by the HUS/OS that sees the inmate on the watch. Any discrepancies shall be corrected and reported to the SC.

_____
Marilyn Chandler Ford
Corrections Director

20